**F I L E D**
CLERK, U.S. DISTRICT COURT

10/6/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ jgu _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>JOHNNY PAUL TOURINO, and<br>SPECTRA EQUIPMENT, INC.,<br><br>          Defendants. | SA CR No. 18-00046(B)-JLS<br><br>I N F O R M A T I O N<br><br>[50 U.S.C. § 1705(a) and (c):<br>Conspiracy to Violate the<br>International Emergency Economic<br>Powers Act; 50 U.S.C. § 1705(a)<br>and (c): Violation of the<br>International Emergency Economic<br>Powers Act; 18 U.S.C. § 554:<br>Smuggling Goods Out of the United<br>States; 18 U.S.C. § 1956(a)(2)(A):<br>Money Laundering; 18 U.S.C.<br>§ 2(a), (b): Aiding and Abetting<br>and Causing an Act to be Done] |

The United States Attorney charges:

<u>Introductory Allegations</u>

At all times relevant to this Information:

1.   Defendant JOHNNY PAUL TOURINO ("TOURINO"), a natural-born United States citizen, resided in Orange County in the Central District of California, where he was the Vice-President, owner, and operator of SPECTRA EQUIPMENT, INC. ("SPECTRA"), a California company, which was also located in and doing business in Orange County, in the Central District of California.

2.    Unindicted coconspirator #1 was located in Iran and facilitated the purchase, payment, and shipment of electronic equipment, including computer servers, to Iran.

3.    Unindicted coconspirator #2 was located in Iran, and owned and operated a front company purportedly located in Hong Kong. Unindicted coconspirator #2 facilitated payment to defendant TOURINO from unindicted coconspirator #1 for the purchase and shipment of computer servers to Iran.

4.    Unindicted coconspirators #3 and #4 were located in Vienna, Austria and attempted to facilitate the sale of servers from defendants TOURINO and SPECTRA to Iran.

5.    U.S. Company #1 was a company located in the state of New York that sold computer servers.  U.S. Company #1 included its wholly owned subsidiary located in Australia.

6.    The computer servers referred to in this information were computers designed to process requests and deliver data to other computers over a local network or the internet.  The computer servers were dual-use commercial goods, which were items that had both a commercial application and a military or strategic use, controlled by the Commerce Control List ("CCL") under Export Control Classification Number ("ECCN") 5A002.A for anti-terrorism and national security reasons.

7.    On February 5, 2012, the President issued Executive Order ("E.O.") 13599 in order to take additional steps with respect to the national emergency declared in E.O. 12957 of March 15, 1995, in light of the deceptive practices of the Central Bank of Iran and other Iranian banks to conceal transactions of sanctioned parties, the deficiencies in Iran's anti-money laundering regime and the

weaknesses in its implementation, and the continuing and unacceptable risk posed to the international financial system by Iran's activities.  E.O. 13599 imposed a broad set of prohibitions on certain dealings in the property or interests in property of Iranian financial institutions, including the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any Iranian financial institution.

8.   Bank Mellat and Bank Keshavarzi were Iranian financial institutions.

9.   Data Processing Iran Company ("DPI") was a computer, technology, and information technology consulting corporation headquartered in Tehran, Iran.

10.  The Grand Jury incorporates by reference and re-alleges these Introductory Allegations into each and every count of this Information as though fully alleged therein.

COUNT ONE

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203, 560.204, 560.206, 560.208, and 560.211]

A.   OBJECTS OF THE CONSPIRACY

Beginning at least as early as in or around January 2013, and continuing up to and including at least in or around July 2017, in Orange County, within the Central District of California, and elsewhere, defendants JOHNNY PAUL TOURINO ("TOURINO") and SPECTRA EQUIPMENT, INC. ("SPECTRA"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit offenses against the United States, namely:

1.   To knowingly and willfully enter into transactions within the United States that evaded and avoided, and had the purpose of evading and avoiding, the regulations governing trade and exports from the United States to Iran, and by a United States person wherever located, to Iran, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.203;

2.   To export, sell, and supply, and to attempt to export, sell, and supply, computer servers from the United States to Iran, and by a United States person wherever located, to Iran, in violation of the regulations that govern trade and exports to Iran, without first having applied for, or through such application obtained from the United States Department of Treasury's Office of Foreign Assets Control ("OFAC"), a license or authorization for such export, in violation 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.204;

3.   To engage in a transaction and dealing in and related to goods, technology, and services for exportation, reexportation, sale and supply, by a United States person wherever located, to Iran,

4

without first having applied for, or through such application obtained from OFAC, a license or authorization for such export, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.206;

4.    To approve, finance, and facilitate, and to attempt to approve, finance, and facilitate a transaction by a foreign person, in violation of the regulations that govern trade and exports to Iran, without first having applied for, or through such application obtained from OFAC, a license or authorization for such export, in violation 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.208; and

5.    To contribute and provide goods and services to and for the benefit of an Iranian financial institution, in violation of the regulations that govern trade and exports to Iran, without first having applied for, or through such application obtained from OFAC, a license or other authorization for such activity, in violation 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.211(b) and (d).

B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished in substance as follows:

1.    Unindicted coconspirator #1, while located in Iran, would communicate with defendant TOURINO regarding the type of computer equipment needed by unindicted coconspirator #1 for export to Iran.

2.    Unindicted coconspirator #1 would cause funds to be transferred from unindicted coconspirator #2 outside the United States to defendant TOURINO in Orange County within the Central District of California to purchase the computer equipment.

3.    Defendant TOURINO would pay U.S. Company #1 for the computer equipment he bought for unindicted coconspirator #1.

4.    Defendant TOURINO would arrange for the computer equipment to be transshipped from Australia and the United States to Hong Kong and the United Arab Emirates ("UAE"), where the computer equipment was ultimately intended to be shipped to Iran to be used by Bank Mellat and Bank Keshavarzi.

5.    Unindicted coconspirators #3 and #4 would attempt to facilitate the sale of computer equipment from defendants TOURINO and SPECTRA to Iran.

6.    Defendants TOURINO and SPECTRA, together with coconspirators #1 and #2, would conceal the end-users of the computer equipment, the source of the funds for payment for the computer equipment, and that Iranian individuals and entities were involved in the purchases.

C.    OVERT ACTS

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendants TOURINO and SPECTRA, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California and elsewhere, on or about the dates identified below, including but not limited to the following:

2015 Australia Purchase

Overt Act No. 1:    In an email dated January 14, 2013, unindicted coconspirator #3 requested a price quotation from defendant TOURINO for computer servers stating that his customer was a financial institution.

Overt Act No. 2:    In an email dated February 12, 2014, defendant TOURINO requested a price quotation from U.S. Company #1 for computer servers.

<u>Overt Act No. 3:</u>    In an email dated February 12, 2014, in response to U.S. Company #1's request for end-user information as required by export regulations, defendant TOURINO falsely stated the computer servers were being sold to a systems integrator in the United Arab Emirates for an end-user bank in Kuwait.

<u>Overt Act No. 4:</u>    In an email dated September 9, 2014, defendant TOURINO told unindicted coconspirator #2 that he should be "warned" about a computer company in Iran called DPI.

<u>Overt Act No. 5:</u>    In an email dated April 15, 2015, defendant TOURINO agreed to pay unindicted coconspirator #3 a commission for assisting defendant TOURINO in selling computer servers.

<u>Overt Act No. 6:</u>    In an email dated April 21, 2015, defendant TOURINO told unindicted coconspirator #3 that unindicted coconspirator #3 should speak to unindicted coconspirator #1's company regarding the computer servers purchase.

<u>Overt Act No. 7:</u>    In an email dated May 25, 2015, unindicted coconspirator #3 asked defendant TOURINO for a price quote for computer servers and stated that he expected a decision the following day on whether unindicted coconspirator #1 would be purchasing the computer servers from him.

<u>Overt Act No. 8:</u>    In an email dated June 26, 2015, defendant TOURINO told unindicted coconspirator #2 that he knew unindicted coconspirator #1's company was the "winning bidder of the deal."

<u>Overt Act No. 9:</u>    In an email dated July 30, 2015, defendant TOURINO told unindicted coconspirator #2 that unindicted coconspirator #1 called to check the status of the computer server deal.

<u>Overt Act No. 10:</u>   Between June 15, 2015 and August 5, 2015, defendants TOURINO and SPECTRA caused nine wire transfers totaling $3.5 million USD to be sent from a front company controlled and operated by unindicted coconspirator #2 in Hong Kong to defendant SPECTRA's bank account in Orange County within the Central District of California for the computer servers and other equipment.

<u>Overt Act No. 11:</u>   Between June 15, 2015 and August 5, 2015, defendants TOURINO and SPECTRA sent three wire transfers totaling $2.19 million USD to U.S. Company #1 through defendant SPECTRA's partner in Australia for the computer servers.

<u>Overt Act No. 12:</u>   In an email dated June 29, 2015, defendant TOURINO told unindicted coconspirator #2 that $900,000 belonging to unindicted coconspirator #2 for the computer servers was safe in SPECTRA's bank account.

<u>Overt Act No. 13:</u>   In an email dated August 5, 2015, an unindicted coconspirator sent unindicted coconspirator #2 a copy of a waybill showing the shipment of tape subsystems, obtained by defendants TOURINO and SPECTRA for unindicted coconspirator #2, from the Hong Kong to Iran.

<u>Overt Act No. 14:</u>   On August 6, 2015, defendants TOURINO and SPECTRA caused four computer servers manufactured by U.S. Company #1 to be shipped from Australia to Hong Kong, and ultimately to Iran.

<u>Overt Act No. 15:</u>   In an email dated August 22, 2015, unindicted coconspirator #2 sent another unindicted coconspirator a copy of the waybills showing the shipment of the computer servers from Hong Kong to Iran.

<u>Overt Act No. 16:</u>   In an email dated August 31, 2015, unindicted coconspirator #1 thanked defendant TOURINO for procuring

and shipping the computer servers, and stated that he wanted to work with defendants TOURINO and SPECTRA when Bank Mellat made another tender offer for five additional computer servers.  In that email, unindicted coconspirator #1 stated that Bank Mellat was the customer in the deal completed with U.S. Company #1's Australian subsidiary between June and August 2015.

Overt Act No. 17:  In an email dated September 2, 2015, unindicted coconspirator #2 told defendant TOURINO that the computer server cabinets were missing doors.

Overt Act No. 18:  In an email dated September 4, 2015, defendant TOURINO told U.S. Company #1 that the doors needed to be shipped to Dubai, UAE.

Overt Act No. 19:  In an email dated September 8, 2015, TOURINO told unindicted coconspirator #1 that he would be interested in an exclusive agreement between TOURINO and unindicted coconspirator #1, that unindicted coconspirator #2 had resolved the biggest obstacle of financing, and that TOURINO advocated giving U.S. Company #1 "limited information" as it would be more accommodating if it did not hear about the deal through multiple sources.

Overt Act No. 20:  In an email dated October 5, 2015, unindicted coconspirator #2 sent an unindicted coconspirator a copy of a waybill showing the shipment of computer server doors from the UAE to Iran.

2017 Purchases

Overt Act No. 21:  In an email dated September 9, 2015, defendant TOURINO requested a price quotation from U.S. Company #1 for computer servers.

1    Overt Act No. 22:   In an email dated September 12, 2015,
2  unindicted coconspirator #1 told defendant TOURINO that Bank Mellat
3  in Iran had officially announced a tender offer for five computer
4  servers.
5    Overt Act No. 23:   In an email dated September 21, 2015,
6  unindicted coconspirator #1 told defendant TOURINO, that he would buy
7  the computer servers from defendant TOURINO because "we had a
8  successful deal."   Unindicted coconspirator #1 also stated that
9  defendant TOURINO knew of his "capabilities and stability in Iran's
10 market."
11   Overt Act No. 24:   In an email dated September 23, 2015,
12 TOURINO told unindicted coconspirator #1 that U.S. Company #1 was
13 interested in the deal and that it could allocate the computer
14 servers if he and his customer were "willing."   Defendant TOURINO
15 also asked unindicted coconspirator #1 if unindicted coconspirator #1
16 "will again be using" unindicted coconspirator #2 to "accomplish"
17 this deal.
18   Overt Act No. 25:   In an email dated September 23, 2015,
19 unindicted coconspirator #1 replied to defendant TOURINO that
20 unindicted coconspirator #2 would be his "agent" in the deal, and
21 that unindicted coconspirator #2 would be "in direct contact . . .
22 for the details."
23   Overt Act No. 26:   In an email dated September 30, 2015,
24 defendant TOURINO told unindicted coconspirator #3 that a "Bank" was
25 interested in purchasing computer servers and that there were only
26 four computer servers left that met the bank's need.
27   Overt Act No. 27:   In an email dated October 1, 2015,
28 unindicted coconspirator #3 told defendant TOURINO that he would

1   attempt to have unindicted coconspirator #1 purchase the computer

2   servers from unindicted coconspirator #3.

3      Overt Act No. 28:   In an email dated January 14, 2016 that

4   included references to "Tehran" and "Iran," unindicted coconspirator

5   #1 told defendant TOURINO that defendant TOURINO's competitor had won

6   the deal.  Defendant TOURINO forwarded this email to U.S. Company #1

7   on January 15, 2016, but removed the references to "Tehran" and

8   "Iran."

9      Overt Act No. 29:   In an email dated January 18, 2016,

10  defendant TOURINO congratulated his competitor for winning the deal

11  and offered to provide computer servers if the competitor was unable

12  to provide all the required equipment for Bank Mellat.  On February

13  4, 2016, defendant TOURINO replied "[t]hank you for your response"

14  after defendant TOURINO's competitor responded on January 29, 2016,

15  "Iran is sanctioned by the US and I do not want to be involved

16  (directly or indirectly) with any deal related to Iran or even hear

17  about such opportunities."

18     Overt Act No. 30:   In an email dated February 24, 2016,

19  unindicted coconspirator #1 told defendant TOURINO that Bank Mellat

20  had not made its decision regarding whom to purchase the computer

21  servers from and that defendant TOURINO still had an opportunity to

22  obtain the deal.  Unindicted coconspirator #1 also stated that if

23  defendant TOURINO did not accept payment from Iran, unindicted

24  coconspirator #2 could make the payment.

25     Overt Act No. 31:   In an email dated February 25, 2016,

26  defendant TOURINO stated that payment from unindicted coconspirator

27  #2 was acceptable.

28

                                11

1     <u>Overt Act No. 32:</u>   In an email dated March 2, 2016, unindicted

2 coconspirator #1 told defendant TOURINO that he was still awaiting

3 for a purchase order from Bank Mellat and that "Iranian new year" was

4 approaching.

5     <u>Overt Act No. 33:</u>   In an email dated August 26, 2016, defendant

6 TOURINO asked unindicted coconspirator #4 for a status update on the

7 Bank Mellat computer server deal defendant TOURINO had been

8 discussing with unindicted coconspirator #3.   In an email dated

9 August 28, 2016, unindicted coconspirator #4 stated that he was

10 waiting for an answer from Iran.

11     <u>Overt Act No. 34:</u>   In an email dated September 16, 2016,

12 unindicted coconspirator #1 told defendant TOURINO that DPI could

13 purchase a computer server for Bank Keshavarzi from defendants

14 TOURINO and SPECTRA.

15     <u>Overt Act No. 35:</u>   In an email dated November 11, 2016,

16 unindicted coconspirator #1 told defendant TOURINO that he had an

17 upcoming meeting with DPI managers to finalize the deal to purchase a

18 computer server for Bank Keshavarzi.

19     <u>Overt Act No. 36:</u>   In an email dated November 11, 2016,

20 defendant TOURINO asked unindicted coconspirator #1 whether

21 unindicted coconspirator #2 was his "preferred intermediary" with

22 respect to the computer server deal.   In a reply, unindicted

23 coconspirator #1 confirmed that unindicted coconspirator #2 would be

24 in contact "[a]s for the previous deal."

25     <u>Overt Act No. 37:</u>   In an email dated December 16, 2016,

26 defendant TOURINO expressed frustration to unindicted coconspirator

27 #1 regarding the delay of the deals, noting that Bank Mellat and DPI

28 do not always purchase the equipment they identify in their tender

offers.  Unindicted coconspirator #1 responded, "[y]ou are right, this is the true story about Iran's market."

Overt Act No. 38:   In an email dated January 4, 2017, defendant TOURINO provided unindicted coconspirator #1 with a status update regarding the transaction involving the purchase of computer servers for DPI and Bank Mellat.

Overt Act No. 39:   On January 20, 2017, in response to an email from defendant TOURINO regarding the delay, unindicted coconspirator #1 replied "[i]n Iran, Thursdays and Fridays are weekends.  It is not bad for you to know more about your partners (sic) culture."

Overt Act No. 40:   In an email dated January 25, 2017, defendant TOURINO told unindicted coconspirator #1 that the "opportunity [was] perfect" for DPI to purchase a computer server.

Overt Act No. 41:   In an email dated February 1, 2017, defendant TOURINO asked unindicted coconspirator #2 for an update regarding the transaction with DPI for the computer server for Bank Keshavarzi.

Overt Act No. 42:   On February 5, 2017, defendant TOURINO sent U.S. Company #1 a purchase order for four computer servers for a total value of $2,125,000.

Overt Act No. 43:   In an email dated February 6, 2017, defendant TOURINO falsely told U.S. Company #1 that the end-user of the computer servers was a bank in Africa and that the computer servers were "NOT going to Iran."

Overt Act No. 44:   From February 7, 2017, through February 13, 2017, unindicted coconspirator #2 caused to be sent to defendants TOURINO and SPECTRA three wire transfers totaling approximately

$1,235,000 through two front companies located in the United Arab Emirates as partial payment for the purchase of the computer servers.

Overt Act No. 45:   In an email dated February 18, 2017, defendant TOURINO told unindicted coconspirator #2 that he mentioned Africa as a possibility because of a prior computer server deal.

Overt Act No. 46:   In an email dated February 19, 2017, unindicted coconspirator #2 told defendant TOURINO he expected defendant TOURINO to be able to handle the problem of the "formal requirement for an export license" himself.   Unindicted coconspirator #2 told defendant TOURINO that he could claim that the computer servers were going to a "friend's" company in Slovenia and that the price provided an opportunity "for investment."

Overt Act No. 47:   In an email dated February 20, 2017, defendant TOURINO forwarded the February 19, 2017, email to his attorney replacing the word "friend's" and substituting "customers."

Overt Act No. 48:   In an email dated February 20, 2017, defendant TOURINO, through his attorney based in Los Angeles County within the Central District of California, told U.S. Company #1 that the end user for the computer servers was in Slovenia.

Overt Act No. 49:   On February 28, 2017, defendant TOURINO obtained three checks from HomeStreet Bank in Orange County payable to U.S. Company #1 in the amount of $375,000 each, and mailed them to U.S. Company #1 for the purchase of the computer servers.

Overt Act No. 50:   On March 1 and March 6, 2017, unindicted coconspirator #2 attempted to send defendants TOURINO and SPECTRA two wire transfers through two front companies in the United Arab Emirates totaling approximately $1,000,000 as final payment for the computer servers.

1    <u>Overt Act No. 51:</u>   On March 4, 2017, defendant TOURINO

2   requested a license from OFAC to unblock funds falsely stating

3   "Spectra has NO knowledge of, or has ever consented to anyone

4   associated with Iran having any interest in this transaction/wire

5   transfer."

6    <u>Overt Act No. 52:</u>   In an email dated March 17, 2017, defendant

7   TOURINO falsely told his attorney that he did not know that the items

8   at issue in this deal, nor any prior deals, were intended for Iran.

9    <u>Overt Act No. 53:</u>   In March or April 2017, defendant TOURINO

10   deleted email correspondence with unindicted coconspirator #1 from

11   his email account.

12    <u>Overt Act No. 54:</u>   On June 13, 2017, defendant SPECTRA

13   requested a license from OFAC to unblock funds, stating it was

14   unaware that Iranian or sanctioned persons were involved and that it

15   desired to continue with the sale of computer servers to unindicted

16   coconspirator #2.

17

18

19

20

21

22

23

24

25

26

27

28

1

### COUNT TWO

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203, 560.204, and 560.208;

18 U.S.C. § 2(a), (b)]

On or about August 6, 2015, in Orange County, within the Central District of California, and elsewhere, defendants JOHNNY PAUL TOURINO ("TOURINO") and SPECTRA EQUIPMENT, INC. ("SPECTRA"), aiding and abetting each other, knowingly and willfully violated, attempted to violate, and caused to be violated, the United States trade regulations with Iran by approving, financing, and facilitating, and attempting to approve, finance, and facilitate a transaction by a foreign person where the transaction was an export, sale, and supply, to Iran, of computer servers, without first having applied for and obtained by such application the necessary license and authorization from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), for such export, sale, and supply.

Specifically, defendants TOURINO and SPECTRA, both United States persons, negotiated the sale of computer servers with U.S. Company #1, accepted payment from unindicted coconspirator #2 for the computer servers, paid U.S. Company #1 for the computer servers, and caused the computer servers to be sent to Hong Kong knowing they were to be transshipped to Iran, without obtaining a license from OFAC.

<u>COUNT THREE</u>

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203 and 560.206;

18 U.S.C. § 2(a), (b)]

On or about August 6, 2015, in Orange County, within the Central District of California, and elsewhere, defendants JOHNNY PAUL TOURINO ("TOURINO") and SPECTRA EQUIPMENT, INC. ("SPECTRA"), aiding and abetting each other, knowingly and willfully attempted to violate, and cause to be violated, the United States trade regulations with Iran by attempting to engage in, and engaging in, a transaction and dealing in and related to technology and services for sale and supply, directly and indirectly, to Iran, without first having applied for and obtained by such application the necessary license and authorization from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC").

Specifically, defendants TOURINO and SPECTRA brokered, negotiated, and facilitated the sale of computer servers with U.S. Company #1, accepted payment from unindicted coconspirator #2 for the computer servers, paid U.S. Company #1 for the computer servers, and shipped them to Hong Kong knowing they were to be transshipped for unindicted coconspirator #1, who was located in Iran, thereby providing services to Iran, without obtaining a license from OFAC.

<u>COUNT FOUR</u>

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203 and 560.204;

18 U.S.C. § 2(a), (b)]

On or about February 28, 2017, in Orange County, within the Central District of California, and elsewhere, defendants JOHNNY PAUL TOURINO ("TOURINO") and SPECTRA EQUIPMENT, INC. ("SPECTRA"), aiding and abetting each other, knowingly and willfully attempted to violate, and cause to be violated, the United States trade regulations with Iran by attempting to export, sell, and supply, from the United States to Iran, computer servers, without first having applied for and obtained by such application the necessary license and authorization from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), for such export, sale, and supply.

Specifically, defendants TOURINO and SPECTRA negotiated the sale of computer servers with U.S. Company #1, accepted payment from unindicted coconspirator #2 for the computer servers, paid U.S. Company #1 for the computer servers, and intended to take possession of the computer servers and ship them to the United Arab Emirates knowing they were to be transshipped to Iran, without obtaining a license from OFAC.

18

<u>COUNT FIVE</u>

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203 and 560.206;

18 U.S.C. § 2(a), (b)]

On or about February 28, 2017, in Orange County, within the Central District of California, and elsewhere, defendants JOHNNY PAUL TOURINO ("TOURINO") and SPECTRA EQUIPMENT, INC. ("SPECTRA"), aiding and abetting each other, knowingly and willfully attempted to violate, and cause to be violated, the United States trade regulations with Iran by attempting to engage in, and engaging in, a transaction and dealing in and related to technology and services for sale and supply, directly and indirectly, to Iran, without first having applied for and obtained by such application the necessary license and authorization from the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC").

Specifically, defendants TOURINO and SPECTRA brokered, negotiated, and facilitated the sale of computer servers with U.S. Company #1, accepted payment from unindicted coconspirator #2 for the computer servers, paid U.S. Company #1 for the computer servers, and intended to take possession of the computer servers and ship them to the United Arab Emirates knowing they were to be transshipped for unindicted coconspirator #1, who was located in Iran, thereby providing services to Iran, without obtaining a license from OFAC.

<u>COUNT SIX</u>

[50 U.S.C. § 1705(a), (c);

31 C.F.R. §§ 560.203 and 560.211(b) and (d);

18 U.S.C. § 2(a), (b)]

On or about February 28, 2017, in Orange County, within the Central District of California, and elsewhere, defendants JOHNNY PAUL TOURINO ("TOURINO") and SPECTRA EQUIPMENT, INC. ("SPECTRA"), aiding and abetting each other, knowingly and willfully attempted to violate, and cause to be violated, the United States trade regulations with Iran by attempting to engage in, and engaging in, the provision of goods and services to and for the benefit of an Iranian financial institution, without first having applied for and obtained by such application the necessary license and authorization from the United States Department of Treasury's Office of Foreign Assets Control ("OFAC").

Specifically, defendants TOURINO and SPECTRA brokered, negotiated, and facilitated the sale of computer servers with U.S. Company #1, accepted payment from unindicted coconspirator #2 for the computer servers, paid U.S. Company #1 for the computer servers, and intended to take possession of the computer servers and ship them to the United Arab Emirates knowing they were to be transshipped to and for the benefit of Bank Mellat, without obtaining a license from OFAC.

COUNT SEVEN

[18 U.S.C. §§ 554, 2(a) and 2(b)]

On or about February 28, 2017, in Orange County, within the Central District of California, and elsewhere, defendants JOHNNY PAUL TOURINO ("TOURINO") and SPECTRA EQUIPMENT, INC. ("SPECTRA"), aiding and abetting each other:

(1) attempted to fraudulently and knowingly send and export from the United States merchandise, articles, and objects contrary to a law and regulation of the United States; and

(2) did, and attempted to, knowingly receive, conceal, buy, and sell, and did, and attempted to, knowingly facilitate the transportation, concealment, and sale of merchandise, articles, and objects, knowing the same to be intended for exportation contrary to a law and regulation of the United States.

Specifically, defendants TOURINO and SPECTRA did, aided and abetted, and willfully caused others known and unknown to the Grand Jury to purchase, export, transport, and send from the United States computer servers, after representing that the ultimate country of destination was Slovenia, when in fact defendants TOURINO and SPECTRA knew that the computer servers were intended to be sent to Iran and an Iranian financial institution.  Defendants TOURINO and SPECTRA purchased, attempted to purchase, and attempted to effect the export of the computer servers without applying for and obtaining by such application the necessary license and authorization before attempting to send and export the computer servers from the United States.

COUNTS EIGHT THROUGH TWENTY-FOUR

[18 U.S.C. § 1956(a)(2)(A), 2(a) and (b)]

On or about June 15, 2015 through on or about March 6, 2017, in Orange County, within the Central District of California, and elsewhere, defendant JOHNNY PAUL TOURINO ("TOURINO") and SPECTRA EQUIPMENT, INC. ("SPECTRA"), aiding and abetting each other, transported, transmitted, and transferred, a monetary instrument and funds to a bank in the Central District of California from and through a place outside the United States, namely the Hong Kong and the United Arab Emirates ("UAE"), with the intent to promote the carrying on of a specified unlawful activity, to wit: (1) violating the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701-1707, and Iranian Transaction and Sanction Regulations, Title 31, Code of Federal Regulations, Sections 560.203, 560.204, 560.206, 560.208 and 560.211, and (2) unlawful smuggling, Title 18, United States Code, Section 554.

Counts Eight through Twenty-Four were seventeen transactions involving funds and monetary instruments.  Specifically, the transactions were payments to and by TOURINO for the purpose of purchasing, smuggling, illegally exporting, and sending to Iran, and providing related to services to Iran, export-controlled items without first obtaining the required licenses to do so.

| COUNT | DATE | AMOUNT | SENDER/RECIPIENT |
|---|---|---|---|
| EIGHT | 6/15/2015 | $200,000 | Unindicted coconspirator #2's Hong Kong Company to SPECTRA |
| NINE | 6/18/2015 | $200,000 | Unindicted coconspirator #2's Hong Kong Company to SPECTRA |

22

| COUNT | DATE | AMOUNT | SENDER/RECIPIENT |
|---|---|---|---|
| TEN | 6/18/2015 | $100,000 | Unindicted coconspirator #2's Hong Kong Company to SPECTRA |
| ELEVEN | 6/22/2015 | $200,000 | Unindicted coconspirator #2's Hong Kong Company to SPECTRA |
| TWELVE | 6/23/2015 | $200,000 | Unindicted coconspirator #2's Hong Kong Company to SPECTRA |
| THIRTEEN | 6/30/2015 | $570,000 | SPECTRA to Australian Partner for U.S. Company #1 |
| FOURTEEN | 7/02/2015 | $250,000 | Unindicted coconspirator #2's Hong Kong Company to SPECTRA |
| FIFTEEN | 7/03/2015 | $250,000 | Unindicted coconspirator #2's Hong Kong Company to SPECTRA |
| SIXTEEN | 7/23/2015 | $550,000 | SPECTRA to Australian Partner for U.S. Company #1 |
| SEVENTEEN | 7/30/2015 | $1,100,000 | Unindicted coconspirator #2's Hong Kong Company to SPECTRA |
| EIGHTEEN | 7/31/2015 | $1,000,000 | Unindicted coconspirator #2's Hong Kong Company to SPECTRA |
| NINETEEN | 8/05/2015 | $1,070,000 | SPECTRA to Australian Partner for U.S. Company #1 |
| TWENTY | 2/07/2017 | $388,954 | Unindicted coconspirator #2's UAE Front Company to SPECTRA |
| TWENTY-ONE | 2/09/2017 | $499,160 | Unindicted coconspirator #2's UAE Front Company to SPECTRA |
| TWENTY-TWO | 2/13/2017 | $346,771 | Unindicted coconspirator #2's UAE Front Company to SPECTRA |

| COUNT | DATE | AMOUNT | SENDER/RECIPIENT |
|---|---|---|---|
| TWENTY-THREE | 3/01/2017 | $479,930 | Unindicted coconspirator #2's UAE Front Company to SPECTRA |
| TWENTY-FOUR | 3/06/2017 | $519,929 | Unindicted coconspirator #2's UAE Front Company to SPECTRA |

## FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Counts One through Seven of this Information.  Each defendant so convicted shall forfeit the following:

a.   All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any offense charged in each such Count; and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph a.

Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

25

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction under Counts Eight through Twenty-Four of this Information.  Each defendant so convicted shall forfeit the following:

a.   Any property, real or personal, involved in such offense, and any property traceable to such property; and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph a.

Pursuant to Title 21, United States Code, Section 853(p) and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof, (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.  Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the convicted defendant, in committing the offense or offenses giving rise to the

forfeiture, conducted three or more separate transactions involving a
total of $100,000 or more in any twelve-month period.

NICOLA T. HANNA
United States Attorney


CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division

ANNAMARTINE SALICK
Assistant United States Attorney
Chief, Terrorism and Export Crimes
   Section

MARK TAKLA
Assistant United States Attorney
Deputy Chief, Terrorism and Export
   Crimes Section